**UNION PACIFIC RAILROAD COMPANY, Appellant,**

**v.**

**Guy E. SNYDER and Lorraine Snyder, Appellees.**

**No. 4954.**

United States Court of Appeals, Tenth Circuit.

Feb. 11, 1955.

Rehearing Denied March 14, 1955.

Clayton D. Knowles, Denver, Colo. (E. G. Knowles, Denver, Colo., was on the brief with him), for appellant.

Frank H. Conry and Samuel D. Menin, Denver, Colo. (Eugene Deikman, Denver, Colo., was on the brief with them), for appellees.

Before BRATTON, MURRAH and PICKETT, Circuit Judges.

MURRAH, Circuit Judge.

In this railroad crossing accident case, tried to the court without a jury, the primary question is whether the judgment of the trial court for personal and property damages in favor of the Snyders, husband and wife owners and occupants of the automobile, is without factual support, hence clearly erroneous.

The accident occurred about 6:30 P.M., January 6, 1951, at the intersection of Highway 287 and the Union Pacific tracks near Fort Collins, Colorado. The night was clear and cold and the pavement partially covered with snow and ice. At the point of the accident, the highway runs generally east and west, and the railroad crosses the highway in a northwesterly-southeasterly direction at less than a ninety degree angle. The automobile was traveling east, the train southeasterly, so that the driver of the automobile approached the crossing with the oncoming train on his left. Both the railroad tracks and the highway are slightly elevated above the surface of the ground lying between the highway and the tracks, and for more than 1000

feet west of the crossing from whence the automobile approached, the highway is straight and the view unobstructed. In this space between the highway and the tracks there is nothing to prevent the driver of an automobile from observing an approaching train. On the south side of the highway and on the driver's right, there were several houses with driveways entering the highway. Immediately west of the crossing a country road enters the highway from the south and on the corner formed by this junction there were a lighted milk bar and a gasoline station with lighted pumps and a lighted sign above. There were several cars parked around the intersection; two of them at the filling station were pointed in the direction of the approaching car. The crossing was marked with the usual cross-buck warning sign painted with white luminescent paint. 250 feet west of the crossing a warning of the crossing is painted in white letters on the pavement, but these letters were partially covered by snow and ice. About 70 feet further west, or about 320 feet from the crossing, and on the right shoulder of the highway, there was a reflectorized yellow warning sign with black letters. There were no other lighted signals or other special warnings of the railroad crossing.

On the day of the accident, the Snyders had driven from Salt Lake City and intended to reach their home in Denver that night. They had been driving about 50 miles an hour when they came up over a knoll about 1000 or 1500 feet west of the crossing where the driver saw the lights of the milk bar and filling station. He slowed down to about 40 miles an hour and dimmed his headlights, but did not see the reflectorized sign on the side of the highway or the cross-buck sign at the crossing. When he first saw the firebox of the engine of the train, he was about the width of a city street away and traveling about 30 miles an hour. He immediately shifted into second gear and applied the brakes, turning his car with the engine, which he struck just below the cab. The car was carried with the engine about 350 feet down the tracks until the engine stopped. The skid marks on the highway, measured by a highway patrolman, commenced 147 feet from the point of impact.

The train approached the crossing at a speed estimated at 20 to 30 miles per hour. When the engineer had given the usual whistle blasts about 200 or 250 feet from the crossing, he noticed that the Snyder automobile was not slowing down. He thereupon "bore down on the whistle again and threw the train into emergency." The train involved in this accident made daily trips over this point, but did not operate on a time schedule.

In finding the railroad guilty of negligence and freeing the Snyders of contributory negligence, the court expressed the view that the railroad crossing was dangerous, primarily because of the angle at which the engine's beam of light extended across the pavement at the intersection. The court expressed the view that while the Snyders could have undoubtedly seen the light of the engine from the opposite direction of the crossing, their view of the light was obscured by reason of the light coming from somewhat the same direction in which the Snyders were traveling; and that in these particular circumstances, ordinary care and prudence required the railroad to have a flagman at this crossing or stop the train. The court also observed that since the train was operated on an irregular schedule, it was likely to cause more accidents, but at the same time noted that the Snyders had no knowledge of the train or its schedules.

No contention is made of the negligent operation of the train in the sense that an employee was guilty of any negligent commission or omission, and the narrow question is whether the railroad negligently failed to provide proper warnings at the crossing.

In Colorado, where this accident arose and whose law governs the rights and duties of the parties, there is no statutory or common law duty to

provide special warning facilities at crossings of this type. Construing Colorado law, we have adhered to the historical rule that "the rights of the general public and those of the railroad company at a crossing of this kind are reciprocal and mutual; and though the common convenience gives to trains precedence over automobiles or trucks in the use of such a crossing, it is upon the condition that the railroad company will give due warning of the approach of its trains in order that automobiles and trucks may be stopped safely and wait for the trains to pass. That which constitutes reasonable warning depends upon the conditions and circumstances at the particular crossing. Of course, the vigilance and care must be greater at crossings in a city or town where travel is heavier than at ordinary crossings in the country * * * But the mere fact that a crossing is in the country does not necessarily in all circumstances relieve the railway company of any duty to maintain a special warning signal. If a crossing in the country is peculiarly dangerous to travelers on account of its location, or mode of construction, or because the track is curved, or the view is obstructed, the railroad company is required in the exercise of ordinary care to meet the peril with a special warning signal such as a bell, an electric wigwag, a flash signal, or other like caution." Interstate Motor Lines v. Great Western Ry. Co., 10 Cir., 161 F.2d 968. And see also 44 Am.Jur. Railroads, § 520, p. 765.

The question whether a particular railroad crossing is so peculiarly hazardous as to require special warnings has been presented and decided in a great variety of circumstances. See cases collected at 24 A.L.R.2d 1161. The question is usually factual, and appellate courts ought not presume to substitute their judgment for the triers of the fact. It is, however, incumbent upon one relying on extraordinary circumstances to prove them by some competent evidence, and the appellate function is to scrutinize the record for that requisite proof. Thus, in Interstate Motor Lines v. Great Western Ry. Co., supra, where a train approached the crossing in a cut and the terrain between the approaching car and the train was elevated substantially above the highway, and a residence, barn and other objects tended to obstruct the view, we thought the question whether ordinary care required special warnings was a question for the jury in Colorado. And, in Chicago & N. W. Ry. Co. v. Golay, 10 Cir., 155 F.2d 842, involving a busy crossing in a Wyoming city where buildings, a gondola car and stacks of material and equipment near the intersection tended to obstruct the view, we also thought the question whether ordinary care and prudence required special warning facilities was for the jury. See also cases collected at 24 A.L.R.2d 1178 et seq.

As we have seen, there is no evidence here of any physical obstruction between the highway and the railroad tracks. The Snyders contend, however, as the trial court found in effect, that an extraordinarily hazardous condition was created by the acute angle at which the engine cast its beam of light across the highway at the intersection; that such angle made it appear that the light was moving in the same direction as the Snyder automobile, thereby creating a dangerous illusion. And, there was testimony to the effect that the direction of the track at that point "could have been a contributing factor to the accident."

Lights at crossings have been contributing factors to peculiarly dangerous conditions. See 24 A.L.R.2d 1185, § 5. We recognized the probabilities of hazardous lights at crossings in Wm. A. Smith Const. Co. v. Brumley, 10 Cir., 88 F.2d 803, where the rays of light from the engine intersected the crossing at an angle of forty-five degrees. In that case, the driver of the automobile and the train approached the crossing from the same general direction; the driver was not blinded by the lights, but the question was whether the lights from the engine so affected the rays of light from the automobile that the driver could not see flatcars being pushed over the

crossing by the engine. And, the case was remanded for proof on that crucial point. We also had occasion to consider the hazardous effect of lights at a railroad crossing in Holt v. Thompson, 10 Cir., 115 F.2d 1013, where a street light about 100 feet from the crossing was claimed to have impaired the efficiency of the automobile's lights so as to prevent the driver of the automobile from seeing railroad cars moving across the intersection. Drawing a distinction between those facts and the facts in the Wm. Smith Construction Co. case, and following the philosophy of Lowdin v. Bowles, Okl., 105 P.2d 1061, 99 A.L.R. 1455, we did not think the presence of the street light at this crossing created a set of circumstances so peculiar and unusual as to cause a reasonably prudent person to anticipate that an automobile, properly equipped with lights and carefully operated, would collide with a passing train, absent special warning or lookout. While we were unwilling to say that a deceptive condition could not be created by lights at the crossing, we were impressed with the uniqueness of the contention.

There is a statement in this record to the effect that the "glare" of the lights of the nearby gasoline pumps and the lighted sign above "prevented Mr. and Mrs. Snyder from seeing what lay beyond." But, there is nothing in the record to support a permissible inference that Snyder was blinded by the lights from the engine or that he was deceived thereby. And, it cannot be successfully contended that the rays from the engine headlights and the stationary lights near the crossing were so diffused as to create a recognizable deceptive condition, for the engine lights were directed away from the stationary lights. If, therefore, the glare of lights prevented Snyder from seeing what lay beyond, it was not by reason of a peculiarly dangerous condition at the railroad crossing, unless the stationary lights at the corner created it.

If this set of circumstances present a factual question of peculiar danger requiring special warnings, it would be difficult indeed to conceive of a country railroad crossing which would not be peculiarly dangerous. All crossings then are peculiarly dangerous and the exception becomes the rule. If such is to be the policy of the law, the Legislature, not the courts, ought to declare it. We can find no evidence in this record to support the conclusion that this crossing was peculiarly dangerous within the meaning of the announced rule.

But even so, we are firmly convinced that the record conclusively convicts the Snyders of contributory negligence barring recovery. Having in mind the reciprocal duty to exercise ordinary care at the crossing commensurate with the circumstances, the driver of the automobile was under a duty to drive his car at such a rate of speed and under such control as to avoid colliding with any person, vehicle or other conveyance on or entering the highway. 1935 C.S.A. c. 16, § 189. And, it was assuredly his duty to exercise reasonable care to observe all warnings, including the ordinary railroad signals. And, irrespective of the doctrine of imputable negligence, it was the wife's duty as a passenger to exercise ordinary care for her own safety, and when necessary to warn the driver of impending danger. Willy v. Atchison, T. & S. F. Ry. Co., 115 Colo. 306, 172 P.2d 958. The Snyders did not see the reflectorized yellow warning signs on the side of the highway, 320 feet from the crossing. After the accident, they noticed that a car parked on the shoulder would conceal the sign. There was a driveway immediately west of the sign and a car parked there would have also concealed the warning sign. But there is no evidence of a parked car either on the shoulder or on the driveway at the time of the accident, or for that matter, any other evidence that the reflectorized sign was obscured from the vision of the Snyders. The evidence shows without dispute that the glare of the stationary lights by the side of the road prevented the Snyders from seeing what lay beyond. In the face of this

obvious danger, they dimmed their lights and proceeded heedlessly into the unknown until they reached a point where it was too late to stop the car, by skidding 147 feet, before striking the engine.

In our view, this constitutes conclusive evidence of contributory negligence, and the judgment is accordingly reversed.